IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
CENTRAL DIVISION

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | : : : : : : : : : : : : : : : : : : : : : | Civil No. 2:07 CV678 DAK <br><br> ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiff, | | |
| vs. | | |
| OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, BUREAU OF LAND MANAGEMENT, | | |
| Defendants, | | |
| and | | |
| UTAHAMERICAN ENERGY INC, | | |
| Intervenor. | | |

On November 15, 2007, this court held an evidentiary hearing on the Southern Utah Wilderness Alliance's ("SUWA") Motion for Preliminary Injunction. At the hearing, SUWA was represented by Mr. Stephen H.M. Bloch, and Mr. Matthew J. Thomas, the Federal Defendants were represented by Mr. Jared C. Bennett, Assistant United States Attorney, and the Intervenor, UtahAmerican Energy, Inc. ("UEI"), was represented by Ms. Denise A. Dragoo and Mr. John Jevicky. Based on the arguments in the parties' written submissions, the evidence proffered at the hearing, and the closing legal arguments of counsel, this court DENIES the Motion for Preliminary Injunction.

**BACKGROUND**

I.   **STATUTORY AND REGULATORY BACKGROUND**

Pursuant to the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 to 287 (2000) ("MLA"), once a coal lease has been issued but "[p]rior to taking any action on a leasehold which might cause a significant disturbance of the environment, . . . the lessee shall submit for the [Secretary of the Interior's] approval an <u>operation and reclamation plan</u>." 30 U.S.C. § 207(c) (emphasis added). 30 C.F.R. § 740.5(a) replaces the phrase "operation and reclamation plan" with "mining plan." Accordingly, in this opinion, the phrase "MLA Mine Plan" is used in place of "operation and reclamation plan." By delegation, the Assistant Secretary for Land and Minerals ("Assistant Secretary") must approve the MLA Mine Plan before any coal mining operations may commence on federal land. 30 C.F.R. § 746.11(a); <u>S. Utah Wilderness Alliance</u>, 163 IBLA 142, 147 (2004) (stating that MLA Mine Plan approval delegated to Assistant Secretary for Lands and Minerals).

In addition to an approved MLA Mine Plan, the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201 to 1328, requires that either the Department of the Interior or a federally delegated state surface mining agency approve a coal mining permit application and reclamation plan ("SMCRA permit") before mining can commence. See 30 U.S.C. §§ 1256(b), 1257. The SMCRA permit governs surface disturbance for coal mining operations. In SMCRA, Congress authorized the Secretary of the Interior to delegate administration and enforcement of SMCRA to states that have a federally approved surface mining program. 30 U.S.C. § 1273(c). In 1981, the Department of the Interior approved Utah's surface mining program and delegated SMCRA administration and enforcement authority to the State of Utah through the Division of Oil, Gas, and Mining ("UDOGM") subject to oversight by the Office of Surface Mining ("OSM"). 30 C.F.R. § 944.30. However, in SMCRA, Congress expressly

prohibited the Secretary of the Interior from delegating approval of the MLA Mine Plan to a state with an approved SMCRA program. 30 U.S.C. § 1273(c); 30 C.F.R. § 745.13(i). Further, in the SMCRA-delegation agreement between the Secretary of the Interior and the State of Utah, the Secretary explicitly "reserves the right to act <u>independently</u> of DOGM to carry out his responsibilities under <u>laws other than SMCRA</u> . . . and in instances of disagreement over SMCRA and the Federal lands program." 30 C.F.R. § 944.30, Art. VI, C.2 (emphasis added). Therefore, the Secretary of the Interior's decision to approve or disapprove an MLA Mine Plan is wholly independent from UDOGM's decision regarding the SMCRA permit.

In order to streamline the submittal and approval processes for MLA Mine Plans and SMCRA permits, the Department promulgated regulations that attempt to avoid duplication and increase coordination between the Department of the Interior and UDOGM. <u>See generally</u> Federal Lands Program; Surface Coal Mining and Reclamation, 47 Fed. Reg. 25,092 (June 9, 1982). Instead of submitting an MLA Mine Plan directly to the Department of the Interior and a SMCRA permit application directly to UDOGM, applicants must submit one "permit application package" ("PAP") to UDOGM, which contains both an MLA Mine Plan and a SMCRA permit application. <u>See</u> 30 C.F.R. § 944.30 Art. VIA; C.4; 30 C.F.R. § 740.5(a) (definition of "permit application package").

Even though the PAP is submitted as one package, it is approved in two separate parts by two separate agencies. Once the lessee submits the PAP, UDOGM must make copies for OSM and BLM. <u>See id.</u> § 944.30 Art. VIA; C.4. As to the SMCRA permit portion of the PAP, UDOGM exercises approval authority by virtue of the above-mentioned cooperative agreement between the Department of the Interior and the State of Utah. <u>See id.</u> § 944.30 Art. VI.C.

As to the MLA Mine Plan portion of the PAP, the Department of the Interior, through the Assistant Secretary, exercises approval authority that is entirely separate and independent from the UDOGM's decision on the SMCRA permit.  30 U.S.C. § 1273(c); 30 C.F.R. §§ 745.13(i); 944.30, C.2; S. Utah Wilderness Alliance, 163 IBLA 142, 147 (2004) ("Not included [in UDOGM's jurisdiction] would be approval of UEI's mining plan, since that authority was retained by the Secretary, under 30 C.F.R. § 745.13, and delegated to the Assistant Secretary, Lands and Minerals.").  In the event that there is a difference between the terms and conditions of the Department-approved MLA Mining Plan and the UDOGM-approved SMCRA permit, UDOGM must alter the SMCRA permit to conform with the MLA Mine Plan.  30 C.F.R. § 944.30 Art. VI, C.4. (f), (g).  Consequently, once UDOGM has approved the SMCRA portion of the PAP and the Assistant Secretary has approved the MLA Mine Plan portion of the PAP, the permittee may engage in mining activities.  An approved MLA Mine Plan remains in effect until modified, cancelled, or withdrawn.  30 C.F.R. § 746.17(b).

Once approved, a lessee may request a revision to the SMCRA permit.  In such cases, OSM must analyze the proposed change to the SMCRA permit to determine whether it amounts to a "modification" of the MLA Mine Plan.  See 30 C.F.R. § 746.18(c).  To determine whether a revision to the SMCRA permit rises to the level of a "modification" of the MLA Mine Plan, OSM must apply the criteria set forth in 30 C.F.R. § 746.18(d).  If OSM determines that the SMCRA permit change rises to the level of a "modification" to the MLA Mine Plan, the Assistant Secretary must approve the modification.  30 C.F.R. §§ 740.13(d)(2); 746.18(a).  However, if OSM determines that the change to the SMCRA permit does not constitute a "modification" of the MLA Mine Plan, the decision need not proceed any further within the Department of the Interior than OSM.  30 C.F.R. § 746.18(c)(1).

II.     **FACTUAL BACKGROUND**

UEI controls six federal coal leases that are located along the western slope of the Book Cliffs east of Highway 191/6 in Emery County, Utah. The leases were issued in 1946, 1947, 1950, and 1955. Ex. 1 at 1. From these six leases, UEI seeks to access and produce 1.5 million to 4 million tons of coal per year. Ex. 1 at 1.

On September 8, 1998, UEI's predecessor-in-interest submitted a PAP to UDOGM. Ex. 7. UEI acquired the leased area on December 21, 1998 and continued pursuing the PAP that its predecessor-in-interest had previously submitted. Ex. 7. UDOGM deemed UEI's PAP complete on February 26, 1999. Ex. 7. Once the PAP was deemed complete, UDOGM provided the MLA Mine Plan to the Department of the Interior for consideration while UDOGM considered the technical adequacy of the SMCRA permit.

In September 2000, the Defendant, Bureau of Land Management ("BLM"), finalized its Environmental Assessment ("EA") in accordance with NEPA, analyzing the environmental impacts of the three applications submitted by UEI for rights-of-way on public lands outside the lease area covered by the MLA Mine Plan. The right-of-way application relevant to SUWA's motion for preliminary injunction sought permission to construct, operate, and maintain the surface facilities necessary to operate the coal mine, process coal, and load it for hauling to the railroad. Following completion of the EA on October 27, 2000, the BLM issued a Decision Record and Finding of No Significant Impact ("DR/FONSI") in which it: (1) recommended that the Assistant Secretary approve the MLA Mine Plan; and (2) approved the issuance of the

currently contested right-of-way contingent upon the Assistant Secretary's approval of the MLA Mine Plan.[1]  Ex. 5; UEI Ex. 9 (FONSI, Oct. 27, 2000).

UDOGM approved the SMCRA permit on July 27, 2001.  Ex. 7 at 2 (unnumbered).  On September 4, 2001, SUWA filed an objection to UDOGM's approval of the SMCRA permit.  Ex. 7 at 2.  On November 5, 2001, the Assistant Secretary approved the MLA Mine Plan.  Ex. 6.

On December 14, 2001, after the Assistant Secretary approved the MLA Mine Plan, the Board entered an order affirming in part SUWA's September 4, 2001 objections, and remanded UEI's July 21, 2001 SMCRA permit to UDOGM for further agency action consistent with the Board's decision.  Board Order at 20, UEI Ex. 4.

Without a SMCRA permit, UEI could not engage in surface disturbing activities as part of its mining operations.  30 U.S.C. § 1256(a).  Consequently, on January 15, 2002, UEI requested that BLM suspend the diligent development period on its leases pursuant to § 39 of the MLA, 30 U.S.C. § 209.  Ex. 3.

In February 2002, UEI submitted a revised SMCRA permit application to UDOGM for consideration.  Ex. 7 at 2.  On May 21, 2002, UDOGM conducted an informal conference at SUWA's request regarding UEI's permit application.  Ex. 7 at 2.  SUWA also intervened in the Board proceedings regarding the SMCRA permit in October 2002.  Ex. 7 at 2.

On November 14, 2002, BLM granted UEI's request to suspend the leases in the interest of conservation pursuant to 30 U.S.C. § 209.  Ex. 3.  In its suspension decision, BLM recognized that UEI's SMCRA permit was remanded in December 2001.  Ex. 3 at 3 of 7.  BLM also found that "UEI cannot proceed with mine development or production due to appeals and actions beyond the scope of UEI's control.  Further, UEI has continued to pursue options to gain

---

[1] SUWA appealed BLM's EA and Decision Record/Finding of No Significant Impact to the Interior Board of Land Appeals, which affirmed BLM's decision and EA in toto.  S. Utah

necessary permits to begin mine development followed by production." Ex. 3 at 2 of 7. BLM then made the suspension retroactive from September 4, 2001–the day SUWA filed its first challenge to the SMCRA permit before the Board of Oil, Gas, and Mining–until "fifteen days after the final court decision" in SUWA's appeal of the SMCRA permit. Ex. 3 at 3 of 7. Finally, as part of the suspension, BLM required that UEI provide yearly certificates updating BLM on the status of the SMCRA permit and that UEI not engage in beneficial use of the leased area. Ex. 3 at 6 of 7. After the November 14, 2002 suspension decision and every year until 2006, UEI submitted to BLM the required yearly certifications, which stated that "UEI cannot proceed with mine development or production due to appeals and actions beyond the scope of UEI's control." Docket No. 3 at 90. Also, since September 4, 2001 until the present, the Department of the Interior has not required UEI to pay lease rentals. Ex. A, ¶¶ 9, 10.

After UEI addressed certain administrative deficiencies, UDOGM deemed the permit application administratively complete on March 26, 2004. Ex. 7 at 3. Once again, SUWA requested an informal conference regarding UEI's SMCRA permit application, which occurred on July 7, 2004. Ex. 7 at 3. Following that conference, UEI continued to resolve deficiencies that UDOGM identified in UEI's application.

In November 2004, UEI requested BLM's permission to conduct exploratory drilling on some of its leases. Ex. A, ¶ 9. However, BLM informed UEI that exploratory drilling operations constituted beneficial use of the lease and would result in BLM lifting the suspension. Ex. A, ¶ 9. UEI withdrew its exploratory drilling request. Ex. A, ¶ 9.

After UEI made further revisions to the application, in September, 2005, UDOGM found the application to be technically adequate. SUWA requested another informal conference regarding UEI's SMCRA-permit application, which was held on November 8, 2005. Ex. 7 at 3.

---

Wilderness Alliance, 163 IBLA 142, 159 (2004).

One month later, SUWA requested and was granted yet another conference with UDOGM about UEI's SMCRA permit on December 8, 2005. Ex. 7 at 3. After these conferences, UDOGM asked UEI to provide more information regarding its SMCRA permit application.

On March 2, 2007, BLM amended its November 14, 2002 suspension decision. BLM stated that the lease suspension would "terminate effective fifteen days after notification by the authorized officer following completion of all State permit and Federal actions, including resolution of potential administrative and judicial appeals." Ex. 9 at 1.

After further revisions to the SMCRA permit application stemming from the November and December 2005 conferences, UDOGM issued UEI's SMCRA permit on May 18, 2007. Ex. 7 at 1. As of this date, UEI was authorized to commence mining operations. On June 1, 2007, SUWA filed another appeal with the Board objecting to UEI's SMCRA permit.

On June 26, 2007, OSM determined that the May 18, 2007 approval of the SMCRA permit "does not require a mining plan modification because this permit action does not meet any of the criteria of 30 C.F.R. 746.18(d)." Ex. 14. Consequently, OSM determined that the Assistant Secretary did not need to re-approve the November 2001 MLA Mine Plan.

On July 31, 2007, SUWA mailed a letter to the Secretary of the Interior and to UDOGM entitled "60-day Notice of Intent to Sue" in which SUWA alleged violations of SMCRA. Ex. B. On September 11, 2007, 42 days after mailing its "Notice of Intent to Sue," SUWA filed its complaint with this court that initiated the instant action alleging a violation of SMCRA and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 to 4347, in its first and second causes of action respectively. Docket No. 1 at 11 and ¶ 68.

The next day, on September 12, 2007, SUWA filed with the Board a motion to stay mining activity on UEI's permit. Specifically, SUWA sought to stay construction of mine-

related surface facilities on BLM's right of way within the SMCRA permit. On October 24, 2007, after a hearing, the Board denied SUWA's motion to stay mining activity pending SUWA's administrative challenge to the SMCRA permit.

On November 5, 2007, SUWA amended its complaint herein, kept its first cause of action alleging a violation of SMCRA, added a new second cause of action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and moved its NEPA claim to the third cause of action. Docket No. 2 at 13, ¶ 77. Almost two months after filing its original complaint commencing this action, SUWA filed a motion for a temporary restraining order and for a preliminary injunction on November 6, 2007. Docket Nos. 4 and 5. Pursuant to SUWA's motion, this court held a hearing on November 6, 2007 at which the parties agreed that no on-the-ground disturbance would take place under UEI's SMCRA Permit until the court ruled on the motion for preliminary injunction. The court also set the hearing for the preliminary injunction for November 15, 2007 and ordered the Federal Defendants and UEI to submit their responsive memoranda to SUWA's motion by November 13, 2007. SUWA was allowed to submit a reply memorandum by November 14, 2007. The parties timely filed their respective memoranda.

On November 15, 2007, this court held a hearing on SUWA's Motion for Preliminary Injunction. At the hearing, SUWA presented its case-in-chief by calling its only witness, Allison Jones, to establish irreparable harm to native vegetation and cryptobiotic soil crusts. After both the Federal Defendants and UEI cross-examined Ms. Jones, the Federal Defendants moved, with UEI joining, to exclude Ms. Jones as an expert witness under Fed.R.Evid. 702, which this court denied, noting that the Federal Defendants' motion went to weight instead of admissibility. After resolving the Federal Defendants' motion, SUWA rested. The Federal Defendants proffered only one witness, James Kohler, who testified as to the facts surrounding the

November 2002 suspension decision and the public interest in the UEI's six coal leases. SUWA declined to cross-examine Mr. Kohler. Finally, UEI proffered the testimony of three witnesses: Robert Jay Marshall, Dr. Michael King, and Ray Peterson, Emery County Public Lands Administrator, who expressed the position of the Emery County Commission on the issues presented by SUWA's motion for an injunction. Mr. Marshall testified about UEI's SMCRA permitting process, the project for which SUWA seeks an injunction, and the effects which granting an injunction would have on UEI. Of the three UEI witnesses, SUWA only cross-examined Mr. Marshall. Dr. King testified through his declaration that the cryptobiotic survey methods employed by SUWA's only witness, Ms. Jones, were not accepted as accurate in the scientific community. Mr. Peterson's testimony was also received via declaration regarding the economic impacts that enjoining UEI's operations would have on members of the public in Emery County. Finally, this court heard the legal arguments of counsel and ordered that each side prepare an order for the court's review.

## ANALYSIS

SUWA has failed to carry its heavy burden for a preliminary injunction. A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." Federal Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1256 (10th Cir. 1999). To carry its heavy burden, SUWA "must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will

not adversely affect the public interest." General Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007).  If the movant establishes that the last three requirements "tip strongly" in its favor, then instead of having to show a "substantial likelihood of success on the merits," the movant must establish "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Valley Cmty. Press Comm'n v. Mineta, 373 F.3d 1078, 1084 (10th Cir. 2004) (quoting Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  SUWA has failed to meet this burden under either standard.

### I.    SUWA HAS FAILED TO SHOW THAT IT IS LIKELY TO SUCCEED ON THE MERITS

SUWA argues that it is likely to succeed on the merits of its first two causes of action in SUWA's "Amended Complaint for Declaratory and Injunctive Relief."  Docket No. 3.  SUWA's first cause of action alleges that OSM's decision not to seek the Assistant Secretary's re-approval of the MLA Mine Plan violated SMCRA and, therefore, was arbitrary and capricious under the APA.  Docket No. 2, ¶ 77; Docket No. 5 at 14-17.  SUWA's second cause of action alleges that BLM's March 2, 2007 amendment to its November 14, 2002 suspension decision is arbitrary and capricious, in violation of the APA, because UEI's six coal leases had expired nearly two years before BLM's March 2, 2007 decision.  Docket No. 3, ¶¶ 92, 95.  As shown below, SUWA has not demonstrated a substantial likelihood of prevailing on the merits.  Also, it has not raised questions that "are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  Id.

On the merits, SUWA argues in its first cause of action that the Assistant Secretary had to re-approve the MLA Mine Plan because once the Board rescinded UEI's July 21, 2001 SMCRA permit, the Assistant Secretary's "Mine Plan Approval was voided or otherwise rescinded by

operation of law." Docket No. 3, ¶ 74.  SUWA's argument is inconsistent with basic principles of federalism contained in the United States Constitution, SMCRA, its implementing regulations, and the agreement in which the United States delegated SMCRA authority to the State of Utah.

A state agency's decision to rescind a SMCRA permit cannot revoke the Assistant Secretary's approval of the <u>federal</u> MLA Mine Plan.  Under Article VI of the United States Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land."  In SMCRA, Congress expressly reserved to the Secretary of the Interior the exclusive authority to approve an MLA Mine Plan.  30 U.S.C. § 1273(c).  In compliance with this congressional mandate, the Department of the Interior promulgated regulations that give the Secretary the responsibility for "[a]pproval, disapproval, or conditional approval of mining plans."  30 C.F.R. § 740.4(a)(1).  Further, the Department's regulations prohibit the Secretary from delegating MLA Mine Plan approval authority to a state.  30 C.F.R. § 745.13(i).

Consistent with SMCRA and its implementing regulations, the Department of the Interior and the State of Utah entered into an agreement that delegated to Utah SMCRA authority.  In this agreement, "[t]he Secretary reserves the right to act independently of DOGM to carry out his responsibilities under <u>laws other than SMCRA</u>."  30 C.F.R. § 944.30 Art. VI B.4 (emphasis added); 30 C.F.R. § 944.30 Art. VI C.2.  Further, the agreement provides that if the MLA Mine Plan and the SMCRA permit conflict, then UDOGM must modify the SMCRA permit to conform with the <u>federal</u> MLA Mine Plan.  30 C.F.R. § 944.30 Art. VI C.4. (f), (g).  This shows that the federal authority to approve and disapprove MLA Mine Plans is independent from state influence and supreme thereto.  Accordingly, the Board's December 14, 2001 rescission of the SMCRA permit had no effect on the Secretary's approval of the MLA Mine Plan.

Nevertheless, SUWA argues OSM should have asked the Assistant Secretary to re-approve the MLA Mine Plan once UDOGM issued the May 18, 2007 SMCRA permit because, under 30 C.F.R. § 746.13 (a) & (f), "OSM must base its recommendations, at least in part, on the permit application package and the findings of [UDOGM]." Docket No. 35 at 2. However, the plain language of section 746.13 does not support SUWA's argument. Section 746.13 states,

> OSM shall prepare and submit to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan to the Secretary. The recommendation shall be based, at a minimum, upon: . . . (f) The findings and recommendations of the regulatory authority with respect to the permit application and the State program[.]

30 C.F.R. § 746.13. OSM's interpretation of this regulation "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' In other words, we must defer to the [OSM's] interpretation unless an 'alternative reading is compelled by the regulation's plain language . . . .'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (citations omitted).

The plain language of section 746.13 does not make the approval of the MLA Mine Plan and the SMCRA permit "inextricably linked," as SUWA argues. Docket No. 5 at 16. Instead, this regulation merely requires OSM to provide UDOGM's comments, along with several other items, to the Assistant Secretary. Section 746.13 does not require the Assistant Secretary to follow or even consider a state's recommendations. Indeed, the Assistant Secretary could not be required to follow the state's recommendations without running afoul of the congressional prohibition on delegating MLA Mine Plan approval authority to the states. 30 U.S.C. § 1273(c).

In any event, SMCRA's implementing regulations contemplate situations in which a change to the SMCRA permit would trigger the requirement for the Assistant Secretary to re-approve the MLA Mine Plan. 30 C.F.R. § 746.18(d). If a change to the SMCRA permit

constitutes a "modification" to the MLA Mine Plan, then the Assistant Secretary must reapprove it. 30 C.F.R. §§ 740.13(d)(2); 746.18(a). However, if the SMCRA permit change does not rise to the level of a "modification" to the MLA Mine Plan, then the decision need go no further within the Department of the Interior than OSM. 30 C.F.R. § 746.18(c)(1).

In this action, OSM determined under 30 C.F.R. § 746.18(d) that the differences between the May 18, 2007 SMCRA permit and the July 27, 2001 SMCRA permit were insufficient to constitute a "modification" of the MLA Mine Plan. Thus, OSM properly concluded that the Assistant Secretary's re-approval of the MLA Mine Plan was not necessary. Despite being part of UEI's SMCRA permit approval process for many years and knowing the components of both the 2001 and 2007 SMCRA permits, SUWA does not attempt to show that the two permits significantly differ. Nor does SUWA refute the testimony of Jay Marshall showing that the underground mining plan from UEI's 2001 and 2007 SMCRA permit did not materially differ. Compare Trial Ex. C, Plate 5-5 (2001), with Ex. D, Plate 5-5 (2007). Instead, the only "difference" SUWA asserts between the two permits is that the 2007 SMCRA permit was issued while the 2001 SMCRA permit was remanded. However, the mere issuance of the 2007 SMCRA permit, without more, does not show that it was so different from the 2001 SMCRA permit as to rise to the level of a "modification" to the MLA Mine Plan. Thus, SUWA has not met its burden on this prong of the preliminary injunction requirement.

      B.    **<u>SUWA's Second Cause of Action</u>**

In its second cause of action, SUWA asserts that BLM's March 2, 2007 decision amending its November 14, 2002 suspension decision is arbitrary and capricious under the APA and should be set aside. Docket No. 3, ¶ 95. According to SUWA, UEI's six coal leases expired in August of 2005 and, therefore, the March 2, 2007 decision could not modify a suspension decision for leases that had already expired. Docket No. 3, ¶ 92. Therefore, SUWA argues,

BLM's March 2, 2007 amended decision was arbitrary and capricious under the APA and had no effect on the six allegedly-expired leases.  Accordingly, SUWA argues, the March 2, 2007 decision and the six leases should be set aside.   Again, SUWA has not demonstrated a substantial likelihood of prevailing on this claim.

Accordingly, SUWA's failure to meet the first requirement for a preliminary injunction--even under the relaxed standard--requires that this court deny SUWA's motion.

## II.  SUWA HAS ALSO FAILED TO DEMONSTRATE THAT IT WILL BE IRREPARABLY HARMED

SUWA alleges that if allowed to go forward, the construction of the surface facilities will irreparably harm SUWA's interest in maintaining native vegetation and cryptobiotic soil crusts.  While the court recognizes that the project might cause some irreparable harm to the trees, shrubs, grasses, and crytobiotic soil in the area, the court finds that SUWA has failed to present sufficient evidence to satisfy this element.

The parties do not dispute that UEI will be required to plant native vegetation in the area once mining operations terminate.   As to the crytobiotic crusts, SUWA has not met its burden in demonstrating that surface disturbance to the site of the surface facilities site will truly be "irreparable," and significant debate exists as to how much of the area at issue is covered by crytobiotic crusts.  Further evidence presented at the hearing also challenges SUWA's assertion that cryptobiotic crusts will be irreparably harmed.  The surface facilities site and the immediate surrounding area are subject to a number of authorized uses which already impact cryptobiotic crusts present in the area.  For example, there are several roads and trails through the site itself and through the surrounding area.  Surface disturbance has occurred in the surrounding area to install a power line.  The site of the surface facilities and the surrounding area are within the Cove grazing allotment, which contains approximately 250 head of cattle.  Furthermore, Mr.

Marshall testified that in his many visits to the site, he frequently sees hikers and campers who use the site. This area has also been affected by fire. Ex. 21, Attach. 2 at 8. Additionally, Mr. Marshall testified that UEI's SMCRA permit requires UEI to take mitigation measures to recover and restore cryptobiotic soils and reestablish cryptobiotic crusts after mining operations cease. UEI Ex. 18.

Thus, there are already disturbances in the area of the surface facilities, there is evidence that cryptobiotic crusts constitute a minute portion of the permit area, and there is a plan to reclaim cryptobiotic crusts after mining operations cease.

Accordingly, this court finds that SUWA has not met its burden on this element.

## III.     THE BALANCE OF THE HARMS WEIGHS AGAINST ISSUING AN INJUNCTION

The court also finds that the balance of the harms does not favor granting a preliminary injunction. To prevail on its motion for a preliminary injunction, SUWA must demonstrate that the threat of injury to the environment outweighs the harm the BLM, the intervenor, or the environment itself will suffer if the injunction is issued. Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1283 (10th Cir. 1996). In other words, SUWA must prove that the balance of harm justifies the injunction.

"When examining the factor — balance of hardships — the court considers the competing claims of injury and balances the hardships on each party of either granting or withholding the requested relief." Utah Envirn. Congress v. Troyer, 2006 U.S. Dist. LEXIS 36608 *9 (remanded on other grounds by Utah Envtl. Cong. v. Troyer, 2007 U.S. App. LEXIS 6466 (10th Cir 2007) (citing Pappan Enters. v. Hardees, 143 F.3d 800, 805 (3d Cir. 1998)). However, "[t]o be entitled to a preliminary injunction, the movant has the burden of showing that 'the threatened injury to the movant outweighs the injury to the other party under the preliminary

injunction.'" Heideman v. S. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003) (quoting Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)).

In light of the BLM's finding of no significant impact regarding SUWA's alleged environmental harm to the surface facilities site and UEI's mitigation plan to restore cryptobiotic soils, the balance of harms weighs in favor of allowing UEI's activities to go forward. Plaintiff asserts that no harm will result from forcing UEI to delay the commencement of its mining activities. Plaintiff's position, however, is disputed. Under the current construction schedule presented at the hearing, UEI's bid packages for subcontractors will be distributed on or about November 20, 2007. Following selection of a contractor and award of contracts, UEI will begin activities including earth work, drainage control and construction of coal hauling systems. Mr. Marshall testified that these activities are necessary for UEI to satisfy the Project's federal coal lease diligence requirements. Moreover, he stated that even a relatively short-term injunction extending through February, 2008 would result in construction delays through July, 2008 due to a series of wildlife-closure restrictions that might be applicable to the mine site. And, if an injunction issues that delays ROW construction, mine development and achievement of diligent development, UEI's federal coal leases may be lost. By contrast, Mr. Marshall testified that the environmental harm alleged by SUWA to be caused by UEI's construction has been fully studied under NEPA and found to be insignificant under the BLM's EA. Cryptobiotic soil impacts are subject to a mitigation plan under the 2007 SMCRA permit.

The evidence presented demonstrates that an injunction will have a significant financial impact on UEI, the federal and state governments, and the local communities within Emery County. A preliminary injunction will delay UEI's employment of some thirty workers during the initial construction phase and, if the project fails, will mean the loss of approximately 220 planned mining jobs. Mr. Marshall testified that this job loss will have a significant negative

impact on UEI and the local economy, particularly in light of the tragic events at the Crandall Canyon Mine resulting in the unanticipated closure of two of UEI's mine operations.

Mr. Marshall testified that in the event that the injunction results in loss of UEI's leases, the project may be terminated. UEI's current leases are valid existing rights which pre-date the wilderness provisions of the Federal Land Policy and Management Act of 1976. If the Project delays result in termination of current leases, the re-lease of UEI's federal leases may be prevented in part or in whole to preserve the characteristics of Wilderness Study Areas within the boundaries of the SMCRA permit. Further, Mr. Marshall confirmed that any new leases would be acquired on a competitive basis after at least two or three years of further study by BLM. This additional delay in leasing may result in loss of the entire Project.

In balance, the harm to UEI, the United States, and the State of Utah of issuing an injunction pending SUWA's challenges to the project outweighs the potential environmental harm to the mine site analyzed in the EA and found by the BLM to be "insignificant." Accordingly, this court denies Plaintiff's request for a preliminary injunction.

**IV.    GRANTING AN INJUNCTION IS NOT IN THE PUBLIC INTEREST**

To meet the final requirement for a preliminary injunction, SUWA must demonstrate that issuance of the injunction is not adverse to the public interest. City of Chanute v. Kan. Gas & Elec. Co., 754 F.2d 310, 312 (10th Cir. 1985). SUWA claims that the public has an interest in ensuring that the BLM complies with federal law and in protecting "the environment," specifically in protecting cryptobiotic crusts.

Although protection of the environment is certainly a factor in balancing the public interest, it is not the only factor. Another factor is Congress's enactment of the MLA, which "was intended to provide wise development of . . . natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public." Cal. Co. v. Udall, 296 F.2d

384, 388 (D.C. Cir. 1961). In fact, Congress recognized that "[t]he public does not benefit from resources that remain undeveloped, and the Secretary must administer the Act so as to provide some incentive for development." Id. Under SMCRA, Congress has found that, "coal mining operations presently contribute significantly to the Nation's energy requirements . . . and it is therefore essential to the national interest to insure the existence of an expressly and economically healthy underground coal mining industry." 30 U.S.C. § 1201(b). In keeping with Congress's declaration of public policy in support of permitted mineral development under both the MLA and SMCRA, evidence proffered by Jay Marshall and Ray Petersen at the hearing shows that the mining operations at issue will provide for immediate jobs for out-of-work residents of Emery County, which will soon lead to coal production that will create more jobs and revenue for the United States, State of Utah, and Emery County.

Thus, while there are approximately 2.5 acres of cryptobiotic crust, there are also six coal leases, which are protected property interests under the Fifth Amendment to the United States Constitution, and a congressional determination that underground coal development is an activity that is beneficial to the public who owns the resources. Added to that side of the balance are the jobs and revenue that UEI's mining operations provide, which is consistent with what Congress intended permitted mineral development to accomplish.

In viewing all the factors relating to the public interest, SUWA has failed to demonstrate that the issuance of an injunction will not harm the public interest.

## CONCLUSION

SUWA has failed to meet its heavy burden to obtain a preliminary injunction, under either the traditional or the more relaxed standard of review. Consequently, this court DENIES SUWA's request for a preliminary injunction.

DATED this 5th day of December, 2007.

_____
DALE A. KIMBALL, JUDGE
United States District Court