**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE et al., | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT and the BUREAU OF LAND MANAGEMENT, | **Case No. 2:07CV678  DAK** |
| **Defendants.** | |
| UTAHAMERICAN ENERGY, INC., a Utah corporation, | |
| **Defendant-Intervenor.** | |

This matter is before the court on Plaintiff Southern Utah Wilderness Alliance's ("SUWA") administrative appeal from three decisions by the Bureau of Land Management ("BLM") and the Office of Surface Mining Reclamation and Enforcement ("OSMRE") relating to UtahAmerican Energy, Inc.'s ("UEI") effort to obtain the necessary permissions to construct and operate a coal mine and related facilities at the proposed Lila Canyon Mine.  A hearing on the Administrative Appeal was held on August 19, 2008.  At the hearing, SUWA was represented by Steven H.M. Bloch and Benjamin J. Wimmer.   The OSMRE and the BLM (collectively referred to as the "Federal Defendants") were represented by Jared C. Bennett. Defendant-Intervenor UEI was represented by Denise A. Dragoo and John E. Jevicky.

Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking this administrative  appeal under advisement, the court has further considered the law and facts relating to this matter.  The court has also considered the Supplemental Authority submitted by SUWA on August 21, 2008, along with the responses to the supplemental authority, filed by UEI on August 22, 2008, and by the Federal Defendants on August 25, 2008.   Now being fully advised, the court renders the following Memorandum Decision and Order.

## INTRODUCTION

In this case, SUWA seeks review of three decisions by the BLM and the OSMRE relating to UEI'S effort to obtain the necessary permissions to construct and operate a coal mine and related facilities at the proposed Lila Canyon mine.  First, SUWA argues that BLM attempted in March 2007 to retroactively suspend UEI's North Block logical mining unit ("LMU") even though the company's leases–according to SUWA–should have been terminated over eighteen months before that time.   SUWA contends that UEI failed to meet its statutorily required diligent development requirements by August 2005, and consequently SUWA seeks an Order from the court directing BLM to terminate UEI's mining unit and the leases held thereunder, as required by the Mineral Leasing Act.

Second, SUWA argues that OSMRE's refusal to prepare a new recommendation for mine plan approval to the Assistant Secretary of the Interior for Land and Minerals regarding the proposed Lila Canyon violated the Mineral Leasing Act ("MLA").  Specifically, SUWA contends that OSMRE's contention that it is not required to issue a new recommendation based

on UEI's recently approved permit application and the new information contained therein was arbitrary and capricious.

Finally, SUWA argues that BLM has arbitrarily refused to consider whether significant new information prepared by UEI and the Utah Division of Oil, Gas & Mining ("UDOGM") between 2002 and 2007–and particularly since BLM finalized an environmental assessment ("EA") in 2000 that granted UEI a right-of-way to construct mine surface facilities and related infrastructure–was sufficiently considered and analyzed in that EA.

Thus, SUWA argues that the Administrative Procedures Act ("APA") requires this court to set aside the Notices to Proceed ("NTP") and mining plan approval that UEI has obtained to construct its proposed Lila Canyon mine.  According to SUWA, these were issued in error and cannot be reissued until the defendant agencies take several actions that they have failed to perform, allegedly in violation of the MLA and the National Environmental Policy Act ("NEPA").   SUWA contends that BLM's violations of the MLA require the court to direct BLM to terminate the North Block LMU and its constituent leases.  SUWA also maintains that OSMRE's and BLM's additional MLA and NEPA violations require at a minimum that the court remand this matter to the agencies for full compliance with their legal duties.

## STANDARD OF REVIEW

Pursuant to the APA, this court must review these agency actions to determine whether they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> An agency decision is arbitrary and capricious if the
> agency has relied on factors which Congress has not intended it

> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs contrary
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see*

*Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999).   This

review, while deferential, must be both "probing" and "in-depth."   *Olenhouse v. Commodity*

*Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v.*

*Volpe*, 401 U.S. 402, 415 (1971)).   This standard is narrow and "[t]he court is not empowered to

substitute its judgment for that of the agency."   *Citizens to Preserve Overton Park v. Volpe* , 401

U.S. 402, 416 (1971); *Olenhouse v. Commodity Credit Corp.*, 42 F. 3d 1560, 1573 (10th Cir.

1994).  Moreover, BLM is entitled to deference on technical issues within its area of expertise.

*Morongo Band of Mission Indians v. Federal Aviation Admin.*, 161 F.3d 569, 576 (9th Cir. 1998).


## DISCUSSION


I.     **Did BLM Violate the Mineral Leasing Act By Retroactively Extending the Diligent Development Period for the North Block LMU?**

On March 3, 1999, BLM approved the consolidation of six federal coal leases into

Logical Mining Unit ("LMU") UTU-73516 (the "North Block LMU") and required that the

LMU meet the regulatory "Diligent Development" requirements by February 1, 2005.[1]   On

---

[1]  The Mineral Leasing Act requires that lessees actually mine "commercial quantities" of coal or
have their leases terminated "at the end of ten years."  30 U.S.C. § 207(a).   "Ten years" runs
from, at the latest, the effective approval date of an LMU.  43 C.F.R.  3840.0-5(a)(13)(i)(B),

4

January 15, 2002, UEI applied for a four-year suspension of operations and production on the North Block LMU.  In its suspension application, UEI argued that "BLM's wilderness re-inventory already resulted in a delay of three and one-half years in BLM's consideration of right of way applications," so that BLM had rendered UEI, by no fault of UEI's, unable to meet the diligent development deadline for the North Block LMU.  UEI also stated that SUWA's successful appeal of the Division's grant of a Surface Mining Control and Reclamation Act ("SMCRA") permit would "further delay permitting." UEI argued that the circumstances justified a total suspension of four years, delaying the diligent development deadline to 2009.

Consequently, on November 14, 2002, BLM granted UEI's request to suspend the leases in the interests of conservation, pursuant to 30 U.S.C. § 209.   In its suspension decision, BLM recognized that UEI's SMCRA Permit was rescinded in December 2001, and BLM also found that "UEI cannot proceed with mine development or production due to appeals and actions beyond the scope of UEI's control.  Further, UEI has continued to pursue options to gain necessary permits to begin mine development followed by production."   BLM then made the suspension retroactive from September 4, 2001–the day SUWA filed its first challenge to the SMCRA Permit before the Board of Oil, Gas, and Mining–until "fifteen days after the final court decision" in SUWA's appeal of the SMCRA Permit.   Finally, as part of the suspension, BLM

---

(ii)(A).   Here, the BLM claims that the diligent development period began to run on February 1, 1995.  SUWA contends that it should have begun no later than January 1, 1994, but it concedes that this one-year difference is inconsequential to the present case.

required that UEI provide yearly certificates updating BLM on the status of the SMCRA Permit and that UEI not engage in beneficial use of the leased area.[2]

SUWA contends that the suspension ended and the diligent development period began to run again by no later than March 10, 2002, when the time for appeal from the Board's remand order expired. According to SUWA, during this period – 2002 to 2007 – the "diligent development" period for the North Block LMU expired, requiring the termination of the LMU and leases. In SUWA's view, The ten-year period began on February 1, 1995, and ran continuously with the exception of the suspension period lasting no longer than from September 4, 2001 to March 10, 2002. According to SUWA, the ten-year period therefore expired in August 2005, and under MLA regulations, the LMU and leases should have been terminated.

On March 2, 2007, BLM issued an order signed by Deputy State Director of Lands and Minerals Kent Hoffman, retroactively modifying its earlier 2002 suspension order. After reciting the expiration date of that earlier order – fifteen days after the final court decision concerning a SUWA appeal dated September 4, 2001 – BLM stated:

> It has come to the attention of this office that there is no court case pending in this matter. Therefore, the duration of the suspension is amended to terminate effective fifteen days after notification by the authorized officer following completion of all State permit and Federal actions, including resolution of potential administrative and judicial appeals.

_____

[2]  In a series of attached stipulations, the order clarified that "[u]pon the effective date of expiration or termination of the approved Section 39 of MLA suspension . . . . all suspended terms and conditions shall be immediately in full force and effect."

SUWA asserts that BLM's attempt to retroactively gift UEI with more time to comply with the statute violates the statute's express command that the leases be terminated.  Once time ran out, SUWA argues, no order could avoid the MLA's command that the LMU and leases "shall be terminated, " and  BLM cannot attempt to use the general suspension provision of 30 U.S.C. § 209 to aggressively write the requirement of § 207(a) out of the MLA.

SUWA contends that reading § 209 to permit retroactive suspension after the diligent development period has expired would effectively destroy the mandatory due diligence requirement of § 207(a).  Under that view, SUWA argues, when the period on any lease expired without sufficient mining, BLM would have the choice either to terminate or to give a retroactive extension, in essence replacing § 207(a)'s "shall be terminated" with "may be terminated."  Such an aggressive use of § 209, according to SUWA, is inconsistent with basic principles of statutory construction and cannot be tolerated.  SUWA maintains that BLM's purported retroactive suspension order is illegal under the MLA.  Consequently, SUWA argues, neither the  2002 nor the 2007 order effectively suspended operations and production on the North Block LMU for the three-year period needed to render UEI's failure to produce coal in compliance with the MLA, and the due diligence period expired in 2005.  Because UEI has yet to produce any coal, let alone commercial quantities of it, SUWA contends that the MLA commands BLM to terminate both the North Block LMU and its constituent leases.

To the contrary, the Federal Defendants–and UEI–argue, among other things, that BLM appropriately suspended the LMU and leases under 30 U.S.C. § 209.[3]   The court agrees with Defendants.   Once the Board of Oil, Gas, and Mining reversed UEI's July 27, 2001 SMCRA Permit, UEI could not effectively develop its leases until UDOGM reissued it a SMCRA Permit. If UEI's diligent development period continued to run for the indeterminate amount of time that its SMCRA Permit was pending before UDOGM, then UEI could lose the leases and the bonus bid that it paid to BLM for the leases.   Denying the suspension would have also likely have adversely affected BLM because potential lessees would bid lower on a coal lease in areas in which environmental litigation is likely if no suspension was allowed until such time as litigation was resolved.

Specifically, the court finds that BLM suspended the diligent development requirements for the LMU, including all six leases, on November 14, 2002, until such time as the UEI obtained its SMCRA Permit through the administrative and judicial processes.   Several indicia in the administrative record support this reading.

First, BLM made its November 14, 2002 suspension decision eleven months after the Utah Board of Oil, Gas, and Mining rescinded UEI's SMCRA Permit, which, as SUWA correctly points out, was outside the time to appeal the Board's decision.   Indeed, if BLM's November 14, 2002 decision suspended the leases for only 15 days after SUWA's September 4,

---

[3]   The Federal Defendants also argue, among other things, that SUWA does not have standing to challenge BLM's interpretation of its suspension order.   The court, however, disagrees.

8

2001 appeal had been resolved, the suspension would have been over before BLM even issued its decision.  BLM would not have issued a meaningless suspension decision.

Second, BLM's November 14, 2002 suspension decision expressly recognizes that the Board rescinded UEI's SMCRA Permit and that UEI had not appealed the recision.  BLM's decision also states that UEI was attempting to gain the necessary permits through the appropriate process.  Given this context, BLM's statement that the leases were suspended "until 15 days after the final court decision of the SUWA appeal dated 4 September 2001," shows that BLM intended the suspension to last until UEI had once again obtained a SMCRA Permit through the administrative process and SUWA's challenges to that permit had been resolved.

Third, BLM's and UEI's subsequent actions support this reading of the November 14, 2002 suspension decision.  For example, *as required by the suspension decision*, UEI submitted certifications that chronicled its progress to obtaining the necessary SMCRA Permits.  As SUWA points out, UEI's required certificates from "2002 to 2006 . . . stated that UEI cannot proceed with mine development or production due to appeals and actions beyond the scope of UEI's control."  UEI's statements in its certifications were correct because even during UDOGM's administrative process, SUWA filed challenges to the sufficiency of UEI's submissions and demanded conferences and hearings with UDOGM to resolve the issues SUWA was raising.  It does not make sense that BLM would require yearly certifications as a suspension condition if BLM believed that the suspension had ended before BLM had even granted it.

As further indicia, four other post-November 2002 acts demonstrate BLM's and UEI's belief that the leases were suspended until all of SUWA's challenges to the SMCRA Permit had been resolved.  First, in November 2004, UEI requested permission to conduct exploratory drilling operations on some of its six leases.  BLM informed UEI that exploratory drilling operations would constitute "beneficial use" thus requiring BLM to lift the suspension. Consequently, UEI withdrew its exploratory drilling request.

Second, from September 2001 to the present, the Department of the Interior has not sought rental payments from UEI.  Having no obligation to pay rentals for the relevant leases is an essential part of a suspension.  43 C.F.R. § 3483.3(b)(1).   Third, on January 12, 2006, BLM issued a decision modifying a minor error in the legal description of lease SL-066490, which is one of the six leases at issue.  Fourth, on February 17, 2006, BLM granted UEI's application to modify its R2P2, which allowed UEI to shorten one of its leased coal panels by approximately 200 feet.

In addition, BLM's March 2, 2007 amendment to the November 14, 2002 decision provides further evidence of this interpretation.  In its March 2, 2007 amendment, BLM recognized that no "court" proceeding was ongoing.  Consequently, BLM clarified that "the duration of the suspension is amended to terminate effective 15 days after notification by the authorized officer following completion of all State permit and Federal actions, including resolution of potential administrative and judicial appeals."   BLM's March 2, 2007 decision recognized BLM's and UEI's understanding of the meaning of the November 14, 2002 suspension decision.   Additionally, BLM's March 2, 2007 decision amended the November 14,

10

2002 suspension decision by suspending the leases until all challenges to all federal and state permit decisions were resolved through the appropriate entities.

Given BLM's and UEI's understanding that the leases were suspended, and given the ambiguity created by the BLM's suspension order, particularly requiring *yearly* certifications from UEI, the court finds that ordering termination of the leases would contradict the equitable purposes for which Congress passed 30 U.S.C. § 209.   "An agency's interpretation of its own order is entitled to great weight."  *Colorado Interstate Gas Co. v. Federal Energy Regulatory Comm'n*, 791 F.2d 803, 810 (10th Cir. 1986) (citations omitted).  The court cannot find that the BLM's decision was arbitrary and capricious, and therefore, the court will not order BLM to cancel the LMU and its constituent leases.

## II.   DID OSMRE VIOLATE THE MINERAL LEASING ACT BY FAILING TO ISSUE A NEW RECOMMENDATION REGARDING MINING PLAN APPROVAL?

A permit to mine federally leased coal in Utah requires both federal and state approval. Under the MLA, 30 U.S.C. § 181, the Secretary of the Interior ("Secretary") reserves exclusive authority to approve an MLA Mine Plan.  30 U.S.C. § 207(c); 30 C.F.R. § 746.11(a). Additionally, SMCRA, 30 U.S.C. § 1251 et seq. requires the Department of the Interior or a federally delegated state agency to approve a surface mining permit application. 30 U.S.C. §§ 1253, 1273; 30 C.F.R. § 944.30.  SMCRA authorizes the delegation of SMCRA permitting to states with federally approved mining programs.  30 U.S.C. § 1273(c).  Utah has an approved SMCRA permitting program, which is implemented by UDOGM in accordance with the State-Federal Cooperative Agreement.  30 C.F.R. § 944.30.

Under the State-Federal Cooperative Agreement, to apply for MLA Mine Plan approval and a SMCRA permit, an applicant need only submit one application for federal and state approval, called a Permit Application Package ("PAP").  30 C.F.R. § 944.30, Art. VI.A; Art. VI.C.4.   The applicant submits the PAP to UDOGM, and UDOGM submits the PAP to OSM and BLM for their review.  The PAP must include a resource recovery and protection plan ("R2P2"), which must be approved by BLM.  43 C.F.R. § 3482.1(b).  The R2P2 is the document that speaks specifically to the leased coal reserves, including a description of the geologic conditions, proposed MLA Mine Plan, coal analysis, mining methods, estimate of the coal reserves and various maps to show the surface and underground mining operations.  *Id.* § 3482.1(c).

While the PAP is submitted as one package to UDOGM, it is approved in two separate parts and under two different statutes.   The Secretary has the exclusive jurisdiction to approve the MLA Mine Plan.  30 U.S.C. § 1273(c); 30 C.F.R. § 745.13(I); 944.30 Arts. VI, B.4, VI, C.2. To assist the Secretary in review of the MLA Mine Plan, OSM prepares and submits a recommendation to the Secretary.  30 C.F.R. § 746.13.  The recommendation is based, in part, on the PAP, including a R2P2, NEPA documentation, and findings and recommendation of BLM on the R2P2 and federal coal leases and UDOGM's findings and recommendations on the PAP.  30 C.F.R. § 746.13.  An approved MLA Mine Plan "shall remain in effect until modified, cancelled or withdrawn and shall be binding on any person conducting mining under the approved mining plan." 30 C.F.R. § 746.17(b).

A SMCRA permit is approved by UDOGM through its delegated authority under the State-Federal Cooperative Agreement.  30 C.F.R. § 944.30.  While UDOGM may issue the SMCRA permit prior to Secretarial approval of the MLA Mine Plan, the SMCRA permit must conform to the terms or conditions of the approved MLA Mine Plan.  30 C.F.R., Art. VI.C.4(f).

An applicant who seeks to amend a SMCRA permit must refrain from any activity on a federal coal lease until OSM has determined whether the SMCRA permit revision requires a MLA Mine Plan modification.  30 C.F.R. § 746.18.  OSM applies the criteria in 30 C.F.R. § 746.18 to determine whether the SMCRA permit amendment requires MLA Mine Plan modification.  If OSM determines that the SMCRA permit revision does *not* require MLA Mine Plan modification, no further administrative review is required.  *Id.*

In this case, UEI's predecessor-in-interest first submitted a PAP to UDOGM for the Lila Canyon Mine on September 8, 1998 (the "1998 PAP").   On February 26, 1999, UDOGM determined that 1998 PAP to be administratively complete and, pursuant to the State-Federal Cooperative Agreement, it sent copies of the PAP, including UEI's R2P2, to the United States Department of the Interior.   UDOGM and federal agencies then reviewed their respective portions fo the PAP under separate criteria.  UDOGM reviewed the PAP to assure compliance with the SMCRA-approved state program.  OSM, BLM, and other consulting federal agencies reviewed the PAP to ensure compliance with federal coal lease terms, the MLA, NEPA, and other federal laws.

In September 2000, BLM and OSM issued an Environmental Assessment under NEPA ("2000 EA").   BLM issued its Decision Record and Finding of No Significant Impact

13

("DR/FONSI") in October 2000, selecting, with certain modifications "Alternative B" of the

2000 EA and granting rights-of-way to UEI and Emery County.  BLM clarified that, in awarding

UEI's rights-of-way, it was only approving the use of the public lands for the proposed mine

surface facilities and that review of the mine plan for purposes of NEPA was under the

jurisdiction of OSM.  BLM further made approval of the rights-of-way contingent upon approval

of the MLA Mine Plan.  On September 26, 2001, OSM, as a cooperative agency in the NEPA

process, relied upon the 2000 EA and issued its Finding of No Significant Impact ("OSM

FONSI") recommending approval of UEI's MLA Mine Plan.

OSM also prepared a recommendation to the Assistant Secretary on UEI's MLA Mine

Plan under 30 C.F.R. § 746.13.  OSM's recommendation specifically included input from the

BLM regarding the R2P2, NEPA compliance documentation and comments UDOGM.  OSM

forwarded its recommendation to the Assistant Secretary, who approved the UEI's MLA Mine

Plan on November 5, 2001.  As discussed below, the court finds that the MLA Mine Plan issued

in 2001 remains in effect and has not been modified, cancelled or withdrawn.  30 C.F.R. §

746.17(b).

On July 27, 2001, UDOGM issued UEI a SMCRA Permit.  On September 4, 2001,

SUWA appealed the permitting decision to the Utah Board of Oil, Gas & Mining.  On December

14, 2001, the Board denied, in part, UDOGM's issuance of the SMCRA Permit and remanded

the matter to UDOGM for further review.   The Board upheld UDOGM's decision to exclude

Emery County Road 126 from the boundaries of UEI's SMCRA Permit.  It also upheld

UDOGM's determination that "wilderness characteristics" of mined lands should not be the

criteria for post-mining land use and reclamation.  However, it remanded the matter to UDOGM

for further action regarding certain baseline data deficiencies in the PAP.

In February 2002, UEI submitted a Revised PAP to UDOGM.  SUWA continued to

challenge UEI's Revised PAP requesting informal conferences before UDOGM on the PAP.

Upon submission of the Revised PAP, the Secretary did not modify, cancel, or withdraw UEI's

MLA Mine Plan.  The MLA Mine Plan primarily relates to federal coal leasing activities which

were not significantly affected by the Revised PAP.   The 2001 Board Order did not address the

MLA Mine Plan or remand the MLA Mine Plan for review by UDOGM or the Secretary.

BLM's R2P2 issued on March 2, 2000, was only slightly modified in the Revised PAP to shorten

one coal panel by 200 feet.   BLM approved this change as a minor modification of an existing

R2P2.  The R2P2 modification was categorically excluded under NEPA because no new surface

disturbance was projected to occur from this action.  Other than this minor modification, UEI's

R2P2 under the Revised PAP was not materially different from the R2P2 under the 1998 PAP.

On May 18, 2007, UDOGM issued UEI a SMCRA permit.  SUWA challenged the 2007

SMCRA Permit before the Board.  Following a ruling by the Board dismissing SUWA's motion

for stay of mining activities, SUWA settled with UDOGM and UEI, and the Board dismissed

SUWA's challenge to the SMCRA Permit.

Shortly after UDOGM issued to UEI the 2007 SMCRA Permit, SUWA requested that

OSM prepare a new recommendation on the MLS Mine Plan because SUWA claimed that "the

PAP recently approved by [UDOGM] is an entirely new document that postdates and replaces

15

earlier versions of the PAP that OSM reviewed and scrutinized."  OSM interpreted SUWA's

letter as a request to modify the UEI MLA Mine Plan, and, on June 26, 2007, OSM denied

SUWA's request to create a new recommendation because the permit issued by UDOGM in

2007 "does not require a mining plan modification."  OSM specifically stated:

> OSM has reviewed the operation and reclamation plan portion of the Horse
> Canyon Mine-Lila Canyon Extension revised permit application, other
> appropriate portions of the Pap related to non-delegable responsibilities, and
> [UDOGM's] decision package of technical analysis and written findings.  OSM's
> review has found that only certain parts of the 1998 PAP were revised to
> incorporate supplemental environmental resources information, and that the PAP
> approved by [UDOGM] on May 2, 2007, is not an entirely new and altogether
> different document.  Operationally, the mining and reclamation operations have
> not significantly changed from the 1998 PAP.

Based on this review, OSM found that the SMCRA Permit issued on May 18, 2007 "does not

require a mining plan modification because this permit action does not meet any of the criteria of

30 C.F.R. § 746.18(d)."  OSM determined that UEI's MLA Mine Plan was not modified,

cancelled.

SUWA contends, however, that OSMRE must prepare a new recommendation to the

Assistant Secretary of Land and Minerals Management ("ASLM") regarding whether UEI's

proposed mining plan should be approved.  While OSMRE had previously recommended

approval, its recommendation, according to SUWA, was not based on the current information in

UEI's state permit application package and the findings of the UDOGM.  SUWA urges the court

to require OSMRE to comply with its duty to thoroughly analyze the permit application package

("PAP") and findings before issuing a new recommendation.

The court, however, agrees with the Federal Defendants and UEI that OSMRE is not required under the MLA to prepare a new recommendation to the ASLM regarding whether UEI's proposed mining plan should be approved.   First, SUWA cannot prove that its alleged injury is fairly traceable to OSMRE's refusal to prepare a new recommendation to the Assistant Secretary regarding UEI's MLA Mine Plan.  To meet the "fairly traceable" requirement, SUWA must show that the harm it suffers is a result of OSMRE's refusal to prepare a new recommendation and not "th[e] result [of] the independent action of some third party not before the court."  *Wyoming v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992).  SUWA concedes in its Opening Brief that the Assistant Secretary decides whether to approve or disapprove an MLA Mine Plan–not OSMRE.   In deciding whether to approve or disapprove the MLA Mine Plan, the Assistant Secretary need not rely on OSMRE's recommendation at all.  SUWA has failed to name the Assistant Secretary as a party to this action.   Consequently, SUWA's alleged injury is not fairly traceable to OSMRE's refusal to prepare a recommendation to the Assistant Secretary, but rather is the result of the "independent action" of the Assistant Secretary who is "not before this Court." *Id*.

Second, even assuming *arguendo* that SUWA's purported injury is fairly traceable to OSMRE's refusal to prepare a new recommendation, requiring OSMRE to prepare a new recommendation to the Assistant Secretary will not remedy SUWA's alleged injury.  SUWA alleges that its purported injuries are caused by the continued existence of the MLA Mine Plan. However, only the Assistant Secretary has the authority to approve, disapprove, or conditionally approve an MLA Mine Plan, not OSMRE.  Therefore, only an order directing the Assistant

Secretary to reconsider the MLA Mine Plan has even the potential to remedy SUWA's alleged injury.  Given that SUWA has failed to name the Assistant Secretary as a party to this action, this court cannot grant SUWA any relief that would remedy its purported injuries.   Accordingly, the court finds that SUWA lacks standing to bring this cause of action.

In addition, the court agrees with the Federal Defendants and UEI that SUWA has failed to invoke a waiver of the United States' sovereign immunity under the APA because OSMRE is not legally required to prepare a new recommendation to the Assistant Secretary regarding an MLA Mine Plan that has never been modified, cancelled, or withdrawn.  The APA provides a limited waiver of sovereign immunity that allows courts to review "agency action." 5 U.S.C. § 702.   The term "agency action" includes an agency's "failure to act." 5 U.S.C. § 551(13).   In order for an agency's "failure to act" to constitute "agency action" for purposes of invoking a waiver of the United States' sovereign immunity, the agency must have failed to perform a legally required, non-discretionary duty.   A "failure to act" amounts to "agency action" for purposes of invoking the APA's waiver of sovereign immunity only when "an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).   In determining the actions that an agency is "required to take," *id.*, reviewing courts are not free to tack on additional requirements in agency regulations "if the agencies have chosen not to grant them." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978).

OSMRE's legal duty to prepare a recommendation for the Assistant Secretary regarding an effective MLA Mine Plan arises only if the approved MLA Mine Plan is modified.  The court

finds that the November 5, 2001 MLA Mine Plan has never been modified, and therefore, OSMRE has no legal duty to prepare a recommendation for the Assistant Secretary. Consequently, OSMRE's refusal to prepare a new recommendation is not "agency action," and, therefore, SUWA has failed to seek judicial review of "agency action."   By failing to challenge "agency action," SUWA has not invoked a waiver of the United States sovereign immunity under the APA.  Thus, the court finds that OSMRE did not violate the MLA by declining to prepare a new recommendation to the ASLM regarding whether UEI's proposed mining plan should be approved.

III.     **DID BLM VIOLATE NEPA BY REFUSING TO CONSIDER WHETHER SIGNIFICANT NEW INFORMATION PREPARED SINCE THE DR/FONSI WAS ISSUED REQUIRED SUPPLEMENTATION OF THE 2000 EA?**

On October 27, 2000, BLM issued a final environmental assessment and decision record concluding that the construction of surface facilities and a coal haul road related to UEI's proposed Lila Canyon mine would not have a significant impact on the environment.   On August 27, 2001, BLM granted UEI a right-of-way to construct surface facilities for the proposed mine, and, on May 31, 2007 BLM issued UEI a notice to proceed for its right-of-way. BLM issued a right-of-way notice to proceed to Emery County, Utah, on March 28, 2007.   On May 16, 2007, SUWA wrote to BLM, urging it to revise its finding of no significant impact before granting notices to proceed on the previous approved rights-of-way.   BLM did not respond to SUWA's letter.

NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  The Council on Environmental Quality has promulgated regulations implementing NEPA.  Pursuant to those regulations, to determine whether an EIS is required, federal agencies may first prepare an EA.  *See* 40 C.F.R. § 1501.4.   An EA must consider several factors to determine if an action will significantly affect the environment, thus requiring the preparation of an EIS.   After considering the "significance" and other relevant factors in an EA, if an agency decides not to prepare an EIS, it must issue a FONSI to justify its decision not to prepare an EIS. 40 C.F.R. § 1508.13.  The FONSI must provide a convincing statement of reasons why the action "will not have a significant effect on the human environment." *Id.*

An agency's NEPA duties do not automatically end when it completes its initial environmental analysis and approves a federal project.   As the Supreme Court has explained, "[i]t would be incongruous with . . . the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Marsh v. Or. natural Res. Council*, 490 U.S. 360, 371 (1989).  Thus, [i]f there remains "major federal action" to occur, and if . . . new information is sufficient to show that the remaining action will "affect the quality of the human environment" . . . to a significant extent not already considered, a supplemental EIS must be prepared.   *Id.* at 374; *see also* 40 C.F.R. § 1502.9(c) (regulations mandating supplementation).

20

Here, SUWA contends that BLM has violated NEPA by refusing to consider significant new information concerning resources – and the likely environmental impacts to these resources –within the project area prepared since the agency issued its DR/FONSI in 2000.   BLM conducted NEPA "scoping" of the Lila Canyon mine in 1999, prepared an EA in September of 2000, and concluded that the mine would present no significant environmental impact requiring the preparation of an EIS on October 27, 2000.  The next year, however, the Board reversed the grant of UEI's state SMCRA Permit, finding UEI's PAP lacking significant information that it was required to provide in order to be entitled to a permit under the Utah Coal Rules.  The Division issued a new permit seven years later, in 2007, only after it was satisfied that these omissions had been remedied.

In the process, according to SUWA, substantial new information was prepared concerning the environment and possible impacts of the mine to those resources were discovered, including: an entirely new vegetation survey of the surface facilities area, new and additional cultural resource surveys, and the location of additional springs within the permit and adjacent areas.   SUWA argues that none of this information is reflected in the 2000 EA, and BLM has refused to even consider whether this significant new information requires supplementation.   SUWA contends that there is nothing in the record to demonstrate that BLM prepared a DNA or undertook some other review or analysis to determine whether the information generated by UEI and the Division since 2000 was adequately analyzed and understood in the EA.

In sum, SUWA argues, BLM's refusal to determine whether it needed to prepare a supplemental analysis to take account of the significant new information generated by the state permitting process was arbitrary and capricious, and thus the court must set-aside BLM's decision to grant the rights-of-way and right-of-way notices related to the Lila Canyon mine.

The court, however, agrees with the Federal Defendants and UEI that SUWA's NEPA claim fails because BLM's issuance of the May 28 and 31, 2007 Notices to Proceed for the coal-haul road and surface facilities does not constitute "major federal action." To satisfy NEPA, an agency must prepare one of the following: (1) an environmental impact statement ("EIS"); (2) an EA, or (3) a categorical exclusion. *Utah Envtl. Cong. v. Russell*, 518 F.3d 817 (10th Cir. 2008). "If an agency is uncertain whether a proposed action will significantly affect the environment, it may first prepare an EA . . . ." *Id.* Sometimes, an initial EIS or EA must be supplemented. *Norton*, 542 U.S. at 72. However, supplementation need not occur "every time new information comes to light" because "[t]o require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find new information outdated by the time a decision is made." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 373 (1989). Instead, "supplementation is necessary if there remains major Federal action to occur." *Norton,* 542 U.S. at 73. "[I]f the actions remaining to BLM . . . after the [right-of-way] grant are 'purely ministerial' or if the agencies have no discretion that might usefully be informed by further environmental review, then there is no 'major federal action' and no [supplemental NEPA document] must be prepared." *Hammond v. Norton*, 370 F. Supp. 2d 226, 255 (D.D.C. 2005); see also *Norton*, 542 U.S. at 73 (holding that there was no "major federal action to occur"

22

because BLM had already approved its land use plan even though plaintiff presented evidence of

changed circumstances after land use plan approved); *Cold Mountain v. Garber*, 375 F.3d 884,

894 (9th Cir. 2004) (finding no major federal action to occur where Forest Service had already

approved and issued a permit allowing bison to be killed even though plaintiffs provided

evidence of changed circumstances after permit issued); *Wyoming v. U.S. Dept. of Interior*, 360

F. Supp. 2d 1214, 1238 (D. Wyo. 2005) (holding no major federal action to occur once agency

finalized its rule regarding gray wolf recovery plan even though plaintiffs provided evidence of

changed circumstances after rule was approved).

  In its September 2000 DR/FONSI, BLM decided to grant UEI a right-of-way to construct

the surface facilities and coal-haul road contingent upon UEI obtaining approval of its mine plan.

In July 2001, BLM and UEI executed right-of-way UTU-77122 for the proposed surface

facilities.  On March 28, 2007, BLM and Emery County executed right-of-way UTU-79542 for

the coal-haul road.   To ensure that UEI and Emery County did not proceed with construction

prior to obtaining mine plan approval, BLM prohibited construction until BLM issued a Notice

to Proceed, confirming that UEI and Emery County had met the pre-construction requirements in

the DR/FONSI.   On May 28 and 31, 2007, BLM issued the Notices to Proceed confirming that

Emery County and UEI respectively had met the pre-construction conditions in BLM's

DR/FONSI.

  Once BLM and UEI executed the July 2001 and March 2007 rights-of-way, BLM

retained no discretion to decide whether the projects should go forward or to determine the terms

and conditions of the projects' approval.   Instead, all that was left for BLM to do was enforce

the pre-construction terms and conditions of its September 2000 DR/FONSI by making Emery

County and UEI wait to commence construction until BLM issued Notices to Proceed.  By

issuing the May 28 and 31, 2007 Notices to Proceed, BLM confirmed that Emery County and

UEI had met the pre-construction requirements of BLM's September 2000 DR/FONSI.  Thus,

SUWA's NEPA claim fails because issuing Notices to Proceed is not "major federal action" that

would require supplemental NEPA.[4]

Even if there were major federal action to occur, SUWA has forfeited its NEPA claim

because it failed to provide the purported new and significant information to BLM prior to the

issuance of the rights-of-way and Notices to Proceed.   SUWA waited until filing its Opening

Brief to introduce to BLM the alleged new and significant information.  Consequently, BLM

never had the opportunity to review this information, which is why it is not part of the

administrative record.  Given that BLM was never given the opportunity to examine or analyze

whether the information in Exhibits 9-11 is new and significant, SUWA forfeited its NEPA

claim.

Even if SUWA's untimely information were to be considered, SUWA has failed to show

that the information is new and will cause impacts significantly different from those considered

in the September 2000 EA.  Generally, supplementation is necessary only where there are

"substantial changes in the proposed action that are relevant to environmental concerns" or

---

[4]  SUWA appears to suggest that UDOGM's  issuance of UEI's May 2007 SMCRA Permit
required supplemental NEPA. Docket No. 57 at 31-32. To the extent SUWA so argues, its
argument fails because UDOGM's decision is a state action under SMCRA, not a "major federal
action[]." 42 U.S.C. § 4332.

"there are significant new circumstances or information relevant to environmental concerns." 40 C.F.R. § 1502.9(c).  "This section is interpreted to require a [supplemental EA] 'if the changed plans or circumstances will affect the quality of the human environment in a significant manner. . . not already considered by the federal agency.'" *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005) (citation omitted).

SUWA cannot show that supplementation of the September 2000 EA is necessary.   First, SUWA has failed to provide any evidence in the record, besides the unsupported statements in its May 16, 2007 letter, showing that BLM was aware of new information when it issued the March 2007 right-of-way to Emery County and its May 2007 Notices to Proceed.  This lack of evidence in the record is fatal to SUWA's claim. *Colo. Health Care Ass'n*, 842 F.2d at 1164 ("A presumption of validity attaches to the agency action, and the burden of proof rests with the appellants who challenge such action.").

Second, even if the court were to consider SUWA's extra-record evidence, SUWA fails to meet its burden of proof.  SUWA alleges that during the SMCRA Permit's re-approval process through UDOGM, the following information was generated: (1) a vegetation survey; (2) additional cultural resource surveys; and (3) the location of additional springs within the permit area and adjacent areas.   However, the mere existence of post-EA information on vegetation, cultural resources, and hydrology, without more, is not enough to meet the heavy burden of showing that the new information "will affect the quality of the human environment in a significant manner . . . not already considered by the federal agency." *Ark. Wildlife Fed'n*, 431 at 1102.  The 2000 EA considered the direct and cumulative impacts of the proposed action on

25

vegetation, cultural resources, and hydrology within the permit area.  SUWA has failed to

provide any argument as to how the extra-record material shows that the project's impacts on

vegetation, cultural resources, and hydrology will be significantly different from what BLM

determined them to be in September 2000.

SUWA's argument and support for its claims simply fails to overcome the presumption

of validity to which BLM's decision not to supplement the EA is entitled.  *See Colo. Health*

*Care Ass'n*, 842 F.2d at1164 ("A presumption of validity attaches to the agency action, and the

burden of proof rests with the appellants who challenge such action."). Therefore, SUWA's

NEPA claim fails.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the relief requested by

SUWA is DENIED.   The court finds that the actions of the BLM and OSMRE were not

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A).

DATED this 13th day of November, 2008.

BY THE COURT:

_____

DALE A. KIMBALL

United States District Judge

26